Steven C. EISEN, D.C.; Alice E. Wright, D.C.; Douglas G. Pfeiffer, D.C.; John Cecchini, D.C.; Deborah A. Carl; and Sally Ann Spall, on Behalf of Themselves and All Others Similarly Situated

v.

INDEPENDENCE BLUE CROSS, Amerihealth Administrators, Inc., Keystone Health Plan East, Inc., Qcc Insurance Company and Amerihealth Insurance Company.

Appeal of: Steven C. Eisen, D.C., Alice E. Wright, D.C., and Douglas G. Pfeiffer, D.C., and John Cecchini, D.C.

Superior Court of Pennsylvania.

Argued Feb. 26, 2003.
Filed Nov. 20, 2003.
Reargument Denied Jan. 22, 2004.

Charles I. Artz, Harrisburg, for appellant.

Edward F. Mannino, Philadelphia, for appellee.

Before: FORD ELLIOTT, KLEIN and MONTEMURO *, JJ.

MONTEMURO, J.

¶ 1 This is an appeal from an order declining to certify as a class in-network providers of chiropractic services, represented by Appellants,[1] who sought relief from allegedly improper policies and practices of Appellee health insurance companies[2] with regard to precertification, that is, required prior authorization of pay-

---

* Retired Justice assigned to Superior Court.

1. Class certification was also sought for Appellees' subscribers who had contracted to receive Appellants' chiropractic services. Certain claims not at issue in this appeal were sustained for the subscribers.

2. Independence Blue Cross is the lead Appellant of which all the remaining Appellants are wholly owned subsidiaries.

ment,[3] for provision of purportedly medically necessary care to subscribers. Appellants instituted this action for breach of the contract governing provision of services.

¶ 2 Appellants' claim rests on the assertion that Appellees have fabricated eight "schemes" designed to deny them reimbursement under the contract; three of these, it is alleged, involved "bundling" and "downcoding" claims; one asserts denial of coverage by unqualified personnel; and four posit application of certain standards and algorithms "which operate as absolute denial mechanisms or irrebuttable presumptions foreclosing meaningful opportunity for individualized analysis of claims." (Appellants' Brief at 10). These allegedly improper practices commenced when precertification reviews were conducted by HCX, a company with which Appellees contracted for the purpose of utilization management, and continued when Appellees created an in house entity, Patient Care Management, to assume this function.

¶ 3 Pennsylvania Rule of Civil Procedure 1702, which governs class certification requirements, specifies that five criteria be met in establishing the existence of a class: numerosity of class members; commonality of questions of law or fact; typicality of claims or defenses; adequacy of representation so as to protect the interests of the class; and fairness and efficiency. After a hearing and review of the documents filed in this matter, the trial court found that the requirements of typicality and predominant common questions of law and fact were not met, and that as a result, a class action would not provide a fair and efficient means of testing Appellants' claims. This appeal followed.

■ ¶ 4 We first note that although the policy of this Commonwealth toward certification of class is both liberal and inclined toward maintaining class actions, *Debbs v. Chrysler Corp.*, 810 A.2d 137, 153 (Pa.Super.2002),

> a lower court's order denying class certification will not be disturbed on appeal unless the court neglected to consider the requirements of the rules governing class certification, or unless the court abused its discretion in applying the class certification rules.

*Baldassari v. Suburban Cable TV Co., Inc.*, 808 A.2d 184, 189 (Pa.Super.2002) (citations omitted).

¶ 5 Appellants' first and second claims challenge the trial court's findings as to commonality, typicality, and the trial court's finding that a class action would not be a fair and efficient method of resolving Appellants' complaints; their third assigns error to the court's interpretation of two class certification cases that Appellants assert are determinative; and their fourth addresses whether remand is necessary to examine those aspects of class certification, numerosity and representa-

---

**3.** The Professional Provider Agreement defines precertification as follows:

1.18 *Prior Authorization/Preapproval.* The approval which the Primary Care Physician, referred specialist or participating hospital must obtain from Independence to confirm Independence coverage for certain Covered Services as specified in the applicable benefit program Requirements. Such approval must be obtained prior to providing Beneficiaries with Covered Services or Referrals. Approval will be given by the appropriate Independence staff, under the supervision of a Medical Director. Approval is not a guarantee of payment if the Beneficiary is subsequently found ineligible. If the Participating Provider or Participating hospital is required to obtain Preapproval, and provides Covered Services or Referrals without obtaining such Preapproval, neither the Beneficiary nor Independence will be responsible for payment.

tion, not addressed by the trial court. We affirm.

¶ 6 Appellants argue that commonality has been demonstrated because their claims all arise from interpretation of a form contract based on the restrictive policies described above. They rely on our decision in *Janicik v. Prudential Ins. Co. of Am.*, 305 Pa.Super. 120, 451 A.2d 451, 457 (1982), for the propositions that "[c]ommon questions will generally exist if the class members' legal grievances arise out of the 'same practice or course of conduct' on the part of the class opponent," and that "[c]laims arising from interpretations of a form contract generally give rise to common questions." Appellants advance the argument that since the contract was common to all providers, the claims for breach too must, of necessity, be based on facts common to all. However, "the common question of fact means precisely that the facts must be substantially the same so that proof as to one claimant would be proof as to all." *Allegheny County Hous. Auth. v. Berry*, 338 Pa.Super. 338, 487 A.2d 995, 997 (1985). "If ... each question of disputed fact has a different origin, a different manner of proof and to which there are different defenses, we cannot consider them to be common questions of fact within the meaning of Pa. R.C.P. 1702." *Id.*

¶ 7 Here, as Appellants correctly argue, the Provider Agreement is, in fact, a form contract that defines the term "medically necessary."[4] The agreement stipulates that coverage be provided to subscribers and/or compensation/reimbursement to providers for the delivery of medically necessary care. In each instance, however, a determination of medical necessity must precede authorization of or payment for services, and is, perforce, based on individual rather than common factors. Although Appellants ostensibly challenge the process by which such decisions are made, precertification must be granted or denied on individual, not common, facts. Indeed, so far from common is the question of what constitutes medical necessity, Appellants conceded that disagreement may exist as to what services a given patient may require. The Complaint specifically "seek[s] relief from [Appellees'] policy and practice of denying medically necessary chiropractic care." (Appellants' Complaint at 2). The decision as to what constitutes medical necessity is therefore a precondition to the grant or denial of treatment, and integral to assessment of whether the grant or denial of precertification or reimbursement was proper.

¶ 8 Appellants also fail to calculate the denial of precertification or reimbursement dependent on the breadth of the coverage carried by each individual patient, a variable which, perhaps even more than the determination of medical necessity, affects Appellees' response to benefit claims. Indeed, the lead plaintiff conceded that the

---

4. The Provider Agreement states:

1.13 *Medically Necessary or Medical Necessity.* The requirement that Covered Services or medical supplies are needed, in the opinion of: (a) the Primary Care Physician or the referred specialist, as applicable, consistent with Independence policies, coverage and utilization guidelines; and (b) Independence, in order to diagnose and/or treat a Member's illness or injury, as applicable, and:

A. are provided in accordance with accepted standards of American medical practice;
B. are essential to improve the Beneficiary's net health outcome and may be as beneficial as any established alternatives;
C. are as cost-effective as any established alternative; and
D. are not solely for the Beneficiary's convenience, or the convenience of the Beneficiary's family or health care provider.

providers' agreement with Appellees would be superceded by the subscriber contracts; not only do these differ between insurers, but between different plans offered by the same insurers.

¶ 9 Appellants examine each of the policies/algorithms they identify as designed to prevent authorization of care, explaining how each is inapposite to the question of medical necessity. However, at the point at which each is allegedly applied by Appellees, the decision to be made is whether the proposed treatment qualifies as medically necessary. Appellants would have us ignore this element of the equation.[5]

¶ 10 With regard to the specifics of the challenged policies, Appellees are accused of systematically denying reimbursement for any care billed under two codes representing the highest level of services, a process termed "downcoding." However, it must be noted that not all Appellees use the codes in question. In addition, Appellants deposed that they rarely, if ever, submitted the codes which are supposedly subject to categorical rejection. Indeed, the lead plaintiff testified that he uses only one code for his patients because it represents the service he provides. This uniformity contradicts one of Appellants' major contentions: that they are improperly denied reimbursement for some services they are licensed to provide. Thus, although Appellants contend, possibly correctly, that individualized medical conditions are not germane to this particular policy application, the admittedly limited use of the objectionable codes either by Appellants or Appellees argues an *a priori* lack of commonality which undermines the substance of the issue.

¶ 11 Appellees are alleged to refuse categorically reimbursement to Appellants for services within their scope of practice. This conduct, termed "bundling," involves the question, not only of whether certain services are reimbursable under a specific plan, but whether those services are or are not related to each other, and thus may be claimed together. Either of these questions is dependent on the individual needs of the patient involved, and thus medical necessity is implicated, adversely affecting commonality. Moreover, as noted above, the details of patient coverage affect what services providers may be paid to supply.

¶ 12 Appellees are accused of systematically denying reimbursement for treatment of patients who require multiple treatments for various related and unrelated medical conditions. The particular breach asserted here is that "even if patients require more than one manipulation on a given day, [Appellees] uniformly refuse[ ] reimbursement for the second treatment." (Appellants' Brief at 18). Intrinsic to this claim is a preliminary determination of medical necessity based on the particular needs of a given patient. It cannot be divorced from individual and thus variant facts.

¶ 13 Appellants assert that Appellees consistently refuse to reimburse for every patient presenting with a chronic condition. Here too, the nature of the illness, whether chronic or acute, determines the appropriate, individual treatment response, and is the precursor to treatment decisions.

¶ 14 Appellees are said to have imposed an arbitrary cap on the maximum number of reimbursable patient encounters by applying undisclosed procedures and caps on treatment where less than 50% but more than 65% improvement has been shown.

5. Moreover, since, obviously, some treatment is provided to some patients, categorical denial is not involved here.

In this connection specifically, Appellants posit the fabrication and utilization guidelines or algorithms designed to function "as absolute denial mechanisms or as irrebuttable presumptions that foreclose any meaningful opportunity for a doctor and patient to receive an individualized determination of medical necessity." (*Id.* at 23). However, Appellants' own testimony was that, in fact, Appellees' responses were inconsistent, even where the same illness suffered by different patients was involved, and that upon second requests, more visits were sometimes authorized. Such factual variations undermine the claim of commonality.

¶ 15 Finally, Appellants' argue that decisions regarding medical necessity are made by unqualified persons, namely nurses, relying on the undifferentiated algorithms discussed above. The contract specifies that preapproval for services "will be given by the appropriate Independence staff, under the supervision of a Medical Director." (Professional Provider Agreement at 1.18). There was testimony, moreover, that the decisions delivered by the nurses could be and were subject to alteration after discussion with a Medical Director. Successful recourse to the discretion of supervisory medical personnel seems to undermine the notion that decisions regarding medical necessity are both uniform and are inevitably made by unqualified employees.

¶ 16 This Court has held that "[w]hile the existence of individual questions of fact is not necessarily fatal [to class certification], it is essential that there be a *predominance* of common issues, shared by all class members, which can be justly resolved in a single proceeding." *Weismer v. Beech–Nut Nutrition Corp.,* 419 Pa.Super. 403, 615 A.2d 428, 431 (1992). A review of Appellants' claims demonstrates that class certification could not have been

granted given the absence of predominantly common questions of law and fact. First, the variation on patient coverage under the subscriber contract dictates the amount and type of services to be reimbursed. Thereafter, variations in service are attributable to whether the proposed treatments were considered medically necessary in a given case. Even assuming that medical necessity was not a factor, evidence of significant variations in preliminary precertification decisions, recertification decisions, and decisions after appeal combine to vitiate any claim of homogeneity.

¶ 17 Appellants insist that "the Trial Court's 'individualized medical necessity' analysis confused elements of proof required to establish class certification with the elements of proof necessary for Doctors to establish the *merits* of the case." (Appellants' Brief at 32) (emphasis original). In so doing, they rely on *Baldassari, supra.* There, as Appellants correctly report, "cable TV subscribers brought a class action challenging the company's $2 late fee as, *inter alia,* breach of contract." (Appellants' Brief at 32). This Court found that the trial court had improperly denied class certification based on the reasonableness of the late fee, overlooking the fact that the same fee had been applied uniformly to the proposed class. However, because the evidence clearly demonstrates that uniform application of the alleged "schemes" is absent here, *Baldassari* is inapt.

¶ 18 Appellants also assert that the trial court focused its attention on individualized damages, not the allegedly uniform cause of those damages. In support, they rely on this Court's decision in *Cambanis v. Nationwide Ins. Co.,* 348 Pa.Super. 41, 501 A.2d 635 (1985). There we held that varying damages claims do not preclude a class action, since the claim was a common

one: the denial of no-fault work loss benefits to estates of retired persons who have lost social security payments because of a fatal accident. *Id.* at 639. Here, the variations in coverage and insurer response do not result in uniform responses.

¶ 19 A showing of typicality presents much the same sort of difficulty, as it too demands an underlying identity of facts. To meet this requirement, "a plaintiff must demonstrate that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.' " *Debbs, supra* at 161 (quoting Pa. R.C.P. 1702). Here, as already noted, so far from wholesale denial of benefits, on occasion an appeal from the rejection of a claim resulted in the approval of further benefits, and for different patients, different responses were forthcoming. Thus, it was unclear that the named representatives were continually, or even almost always, denied reimbursement for medically necessary chiropractic services as a result of Appellees' allegedly improper practices. Moreover, because there was no basic commonality of facts and legal claims, given the diversity of patient coverage and thereafter the medical necessity determinations, a class action would not be a fair and efficient means of resolving the issues; no single proceeding could encompass the many permutations of insurer reaction to benefit claims.

¶ 20 In ruling on the commonality issue, the trial court distinguished *Sharkus v.* *Blue Cross of Greater Philadelphia,* 494 Pa. 336, 431 A.2d 883 (1981), and *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa.Super. 441, 500 A.2d 1137 (1985) (*D'Amelio I* ). In both cases, the inquiry related to the fairness of the insurance companies' conduct in denying benefits retroactively where medical necessity had previously been decided in favor of granting payment and treatment had already been rendered. The trial court herein concluded that because Appellants' claims related to Appellees' prospective behavior only, *Sharkus* and *D'Amelio* were not germane.

¶ 21 Appellants argue that there is no difference between prospective and retroactive denial of claims, because there are shared elements of process involved. First, however, both of the cited cases concern a challenge by consumers to the review process as a whole; individual determinations of medical necessity were not at issue.[6] Here, as the trial court points out, "medical necessity is the threshold issue in order to determine whether or not [Appellants] breached ... the provider agreement." (Trial Ct. Op. at 21). Appellants' Complaint states that denial of precertification or recertification can be demonstrated by the existence of predetermined protocols. However, only by an examination of the application of such protocols in each case can the assessment be made of whether medical necessity was ignored or overlooked. Thus, Appellants'

---

**6.** The Dissent asserts its inability to "see how medical necessity could not be an issue in *Sharkus* and *D'Amelio I* and yet be a question here." (Dissenting Opinion at 10). In both those cases a determination of medical necessity for hospitalization had been made and services rendered. Payment was then denied, either partially or wholly. In *Sharkus* our Supreme Court noted that the determination that there was not medical necessity for the hospitalization was not disputed. *Id.* at 888. In *D'Amelio I* we also found that the objective was not to prove that the hospitalizations were medically necessary. *Id.* at 1143. Here, however, the denial of medical necessity is inseparable from the claim of unfairness: authorization for service is based on a showing of medical necessity; a consistent showing must therefore be made that authorization for treatment has been and is being denied in cases where medical necessity can be demonstrated. Absent such a showing, unfairness in process of the sort alleged by Appellants cannot be proven.

comparison between their claims and those in *Sharkus* and *D'Amelio I* is inapt as this Court's explanation of the principle involved in those cases makes clear:

> Like *Sharkus,* [*D'Amelio I* ] seeks not to prove that plaintiff's hospitalizations were, in fact, medically necessary. Instead, like *Sharkus,* plaintiff in [*D'Amelio I* ] seeks a legal determination that: 1) Blue Cross subscribers may not be held liable for the costs of hospitalization retroactively denied by Blue Cross on the ground they were medically unnecessary; and 2), where Blue Cross disagrees with the determination by the hospital that hospitalization was medically necessary, a solution to that problem must be reached by Blue Cross and the hospital.

*D'Amelio I, supra* at 1143. (footnote omitted).

¶ 22 The thrust of the inquiry in these cases was fairness because subscribers were left without recourse. Such is not the situation herein, both because Appellees' decisions were not immutable and because the precertification clause holds harmless any subscriber treated without preapproval of services. Thus, the trial court correctly distinguished these matters from the instant case.

¶ 23 The Dissenting Opinion defines "the real issue" as "whether the insurance companies methodically and arbitrarily denied claims." (Dissenting Opinion at 14). If indeed a protocol exists to deny such authorization, the proofs must be of consistent, arbitrary refusals. The proofs Appellants have offered fail to sustain their claim since no blanket denial of authorization for services has been shown. At worst, according to their own testimony, some of their requests are sometimes denied.

¶ 24 Authorization protocols, without more, are not assumed to be arbitrary since the existence of protocols of some description for processing requests for service authorization from insurance companies is neither surprising nor inherently suspect. Unfair application of these protocols requires more than speculation, however, and is difficult of proof. The difficulty has not been overcome by Appellants herein.

¶ 25 Because we find no error in the trial court's determination that three of the five elements necessary for class certification have not been met, no remand for further findings is necessary.[7]

¶ 26 Order affirmed.

¶ 27 KLEIN, J. files a Dissenting Opinion.

KLEIN, J., Dissenting.

¶ 1 I respectfully dissent.[8] The majority affirms because it believes that individualized questions about whether certain procedures were "medically necessary" will

---

7. Appellants posit *In re Managed Care Litig.,* 209 F.R.D. 678 (S.D.Fla.2002), as an instance in which providers were granted class status in an action against health insurers. Even were a Federal District Court case controlling authority, and it is not, *Efford v. Jockey Club,* 796 A.2d 370 (Pa.Super.2002), we would find that case distinguishable; class certification was granted under the Racketeering Influenced and Corrupt Organizations Act (RICO), and involved plaintiff/doctors who had already provided services. Neither denial of precertification nor the determination of medical necessity was at issue.

8. For simplicity, I will refer to plaintiffs Steven C. Eisen, D.C., Alice E. Wright, D.C., and Douglas G. Pfeiffer, D.C., and John Cecchini, D.C. collectively as "the chiropractors." Defendants Independence Blue Cross, AmeriHealth Administrators, Inc., Keystone Health Plan East, Inc., QCC Insurance Company and AmeriHealth Insurance Company will be called collectively "the insurance companies."

predominate. The overarching question in this case is whether there was a pattern of denials, not medical necessity. And as a practical matter, given the small potential individual damages awards, these claims will never be litigated except as a class action. The trial court ignores the fairness rationale behind class actions. Instead, the trial court allows itself to be lured astray by the insurance companies' invocation of "medical necessity" and loses sight of the actual focus of the suit—the alleged pattern of denials. The insurance companies want us to believe that a class action is inappropriate because in every case the trial court will have to examine the individual's diagnosis and determine whether the care was, in the meaning of the contract, "medically necessary."

¶ 2 These diversionary tactics are precisely why a class action is necessary. In the case of any individual subscriber patient, the insurer can practically always come up with some justification for the denial. Even the small group of chiropractors here will find it difficult to establish the alleged plot. On the other hand, aggregating the proofs in a class action will cut through the distractions and give the chiropractors their only fair chance at proving their case.

¶ 3 For these reasons, a class action would be the most fair and efficient method of adjudicating the controversies. It would certainly be more efficient than hearing dozens of individual suits. It would be the most fair, because, as I state above, it would be the only realistic way for the chiropractors to present their case.

¶ 4 This is something of a case of first impression in Pennsylvania and has further significance because the common pleas court, Judge John W. Herron, reached the opposite result than was reached in similar litigation ongoing in federal courts. *See In re Managed Care* *Litigation,* 209 F.R.D. 678 (S.D.Fla.2002). Judge Herron's decision also contradicts controlling precedent. *See Sharkus v. Blue Cross of Greater Philadelphia,* 494 Pa. 336, 431 A.2d 883 (1981); *see also D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa.Super. 441, 500 A.2d 1137 (1985) ("D'Amelio I").

¶ 5 The federal managed care litigation is an amalgamation of suits by doctors and subscribers from around the country dealing with claims the insurers used a deceptive scheme improperly to deny coverage. The suits are being handled in a coordinated fashion in the Southern District of Florida under the federal Rules of Procedure of the Judicial Panel on Multidistrict Litigation. *See* 28 U.S.C. 1407 (multidistrict litigation); *see also* R.P.J.P.M.L. 7.4, 7.5. The federal multidistrict litigation rules are akin to Pennsylvania's procedure for coordinating suits in different counties. *See* Pa.R.C.P. 213.1. This particular case has not been removed to federal court.

¶ 6 Nonetheless, the central allegation is the same: the insurers have used a systematic scheme to deny claims improperly. In the federal suit, the district court, Judge Federico A. Moreno, has certified the doctors' claims for class status, which in light of the broader class of plaintiffs, points out the incorrectness of the trial court's position.

¶ 7 I will first review the background of this case. I will then explain why I believe, in light of Judge Moreno's opinion as well as the opinions in *Sharkus* and *D'Amelio I,* class certification should have been granted.

**I. Facts and Procedure**

¶ 8 Plaintiffs Steven C. Eisen, D.C., Alice E. Wright, D.C., Douglas G. Pfeiffer, D.C., John Cecchini, D.C. are doctors of chiropractic medicine who have entered

into contracts with one or more of the defendant insurance companies. The insurance companies operate various health management organizations ("HMOs"). Under the contracts, the chiropractors provide services to the insurance companies' subscribers for reduced rates. In exchange for the rate reduction, the chiropractors are granted full and complete access to the insurance companies' subscribers. The contracts provide that for services to be covered, they must be "medically necessary." "Medically necessary" or "medical necessity" is defined in the chiropractors' contracts:

> The requirement that covered Services or medical supplies are needed, in the opinion of: (a) the Primary Care Physician or the referred specialist, as applicable, consistent with [the HMO's] polices, coverage requirements and utilization guidelines; and (b) [the HMO], in order to diagnose and/or treat a Member's illness or injury, as applicable, and:
>
> A. are provided in accordance with accepted standards of American medical practice;
>
> B. are essential to improve the Beneficiary's net health outcome and may be as beneficial as any established alternatives;
>
> C. are as cost-effective as any established alternative; and
>
> D. are not solely for the beneficiary's convenience, or the convenience of the Beneficiary's family or health care Provider.

¶ 9 In their complaint, the chiropractors allege that beginning in 1996, in an effort to reduce costs, the insurance companies changed how they dealt with chiropractic care. The chiropractors assert that in attempting to contain costs, the insurance companies have breached their contracts with the chiropractors by using eight arbitrary factors to deny coverage:

1. by denying reimbursement for moderately to highly complex problems;

2. by refusing to pay for any chiropractor services other than manipulation;

3. by denying reimbursement for multiple or secondary treatments on the same or subsequent days;

4. by denying reimbursement for chronic conditions;

5. by imposing an artificial cap on the number of times patients may see a chiropractor;

6. by denying all reimbursement once a patient reaches a certain percentage of improvement;

7. by allowing nurses, rather than chiropractors or other qualified caregivers, to deny care; and

8. by relying on undisclosed medical necessity guidelines to deny care for reasons not authorized by the contract.

¶ 10 Alleging the insurance companies breached their contracts by violating the implied covenant of good faith and fair dealing, the chiropractors filed this suit. One year later, they moved for class certification. The motion was assigned to Judge Herron, who held a hearing. At the hearing, the chiropractors presented evidence that the insurance companies were all using the same algorithms, flow charts and treatment codes to deny precertification improperly. (N.T., 4/15/2002, at 19–24; RR. 155a–169a.) Judge Herron explained in an opinion that because he believed the common questions did not predominate over the individual issues, he held that the elements of commonality, typicality, and fairness and efficiency were not present. *See Eisen v. Independence Blue Cross*, 2002 WL 1803721 (Pa.C.P.Phila.Cty.2002).

¶ 11 On appeal, the chiropractors present four questions. The central issue is whether the common questions will predominate over the individual fact questions: [9]

1. Whether the trial court abused its discretion in denying appellants' motion for class certification where appellants' challenges to the insurance companies' impediments to paying the chiropractors' claims demonstrated the requisite commonality, typicality, and fairness and efficiency?

2. Whether the trial court improperly disregarded uncontroverted evidence of the insurance companies' schemes, which establish predominantly common questions of fact or law?

3. Whether the trial court misapplied *Sharkus* and *D'Amelio I* because the procedures in those cases are indistinguishable from the insurance companies' procedures here?

4. Whether the chiropractors presented sufficient evidence to demonstrate numerosity and adequacy of representation to permit this Court to conclude that Pa.R.C.P. 1702(1) and (4) were satisfied without a remand for an additional hearing?

¶ 12 I agree that class certification should have been granted.

## II. Discussion

¶ 13 Although differing somewhat in how they organize the issues, both Pennsylvania and federal law generally require the proponent of the class action to establish the same factors: numerosity of plaintiffs, commonality of issues, typicality of claims/defenses, adequacy of representation, and fairness and efficiency of a class action. *Compare* Pa.R.C.P. 1702 *with* F.R.C.P. 23.

**1. The chiropractors established commonality by showing some evidence of a scheme to deny claims unfairly.**

¶ 14 To satisfy the commonality requirement, the proponent of class certification must show not only a common claim or claims, but also that the common issues predominate over the individual ones. *See* Pa.R.C.P. 1708(a)(1); *see also Weismer by Weismer v. Beech–Nut Nutrition Corp.,* 615 A.2d 428, 430–31 (Pa.Super.1992).

¶ 15 Judge Herron stated that the common issues do not predominate because recovery on each claim depends on a determination of medical necessity in every case. He distinguished *Sharkus, supra,* and *D'Amelio I, supra,* stating that those suits dealt with the insurer retroactively changing rules about who pays if the procedure is later declared "medically unnecessary." For that reason, he saw medical necessity as not being in issue in those cases: "*Sharkus* and *D'Amelio I* both addressed the fairness of Blue Cross's retroactive conduct in denying benefits and not the correctness of the medical necessity determination. Here, in contrast, plaintiffs' claims relate to [the insurance companies'] prospective conduct and not the denial of benefits after treatment was already rendered." *Eisen,* 2002 WL 1803721 at *11. In his view, that made "medical necessity" the threshold issue to

---

9. Judge Herron, too, acknowledged that predominance was the central issue:

Specifically, the Court is unconvinced that the Complaint presents sufficient questions of fact that are common to the class, that the claims and applicable defenses will be typical throughout the class and that a class action is a fair and efficient method to address the plaintiffs' grievances where the common questions do not predominate over individual issues.

2002 WL 1803721 at *8.

determine if the insurance companies breached the provider agreement.

¶ 16 I disagree with the learned trial court's analysis. In *Sharkus,* the proposed class representative plaintiffs all were admitted to Thomas Jefferson University Hospital by a doctor, and after Blue Cross of Greater Philadelphia had paid the bill, it determined that the hospitalization was not medically necessary. As a result, the payment was revoked. *Sharkus,* 431 A.2d at 884–85. When the hospital sought payment from the subscribers, they instituted a class action against Jefferson and Blue Cross. *Id.* at 884. The trial court dismissed the class action, and on appeal this Court affirmed. *Id.*

¶ 17 The Pennsylvania Supreme Court reversed. Although Jefferson Hospital maintained that "individual factual determinations as to medical necessity" were at issue in every case, the Supreme Court saw it differently. 431 A.2d at 887. It explained that the subscribers there did "not seek to prove that plaintiff's hospitalizations were medically necessary." *Id.* Rather, they were challenging the procedure for determining whether payment would be made. *Id.* at 887–88.

¶ 18 This case is no different. The chiropractors do not seek to prove that the treatments were medically necessary. Rather, they are claiming that the insurance companies breached their duty of good faith and fair dealing by denying claims with a set of standards designed to eliminate the more expensive treatments.

¶ 19 For similar reasons, in *D'Amelio I* we held that "medical necessity" was not in issue. There, Larry D'Amelio was admitted to the hospital for a "depressive reaction." *D'Amelio I,* 500 A.2d at 1139. During his stay, the hospital had conducted its own internal review and determined that his hospitalization was medically necessary. *Id.* After he was discharged, the hospital billed D'Amelio's insurer, Blue Cross. Blue Cross paid for some of the hospital stay, but denied the rest as "medically unnecessary." *Id.* D'Amelio instituted a class action, claiming that the members of the proposed class were being held personally liable to the treating hospitals due to Blue Cross' retrospective denials. *Id.* at 1140.

¶ 20 On appeal, we reversed. By way of explanation, we quoted the trial court's assessment of *Sharkus:* "[C]lass certification was appropriate because there was only an *ultra vires* policy that was being challenged, and not an individual, factualized determination." *Id.*

¶ 21 I believe these cases require reversal. Judge Herron himself succinctly described our holding in *D'Amelio I* in a way that shows why his conclusion was incorrect:

> [T]he Pennsylvania Superior Court held that class action relief was appropriate to determine the legality of Blue Cross' retroactive denial of benefits and that medical necessity was not at issue since the action challenged the procedure utilized by Blue Cross in denying benefits after the rendering of treatment and not whether the provider hospital or Blue Cross were medically correct.

*Eisen,* 2002 WL 1803721 at *11.

¶ 22 That is indistinguishable from this case. I do not see how medical necessity could not be at issue in *Sharkus* and *D'Amelio I* and yet be a question here. It was held not in issue there because those cases were about whether subscribers could be liable for hospital bills when the insurance company determined after the fact that the hospitalization was not medically necessary. That is not meaningfully distinguishable from the chiropractors' claim here that the insurance companies

here have all used the same systematic scheme to deny claims improperly.

¶ 23 Although both the majority and the trial court see the so-called prospective effect of the denials of precertification as distinguishing this case from *D'Amelio* and *Sharkus,* I disagree. In either case—denying services before or after the services are rendered—the claim is that the insurers have a shared scheme to deny the claims. I simply see no distinction. With all due respect, the esteemed majority and the trial court have in effect nullified the holdings of those cases, at least in this appeal.

¶ 24 In addition, Judge Moreno's certification of a class action in the major federal action points out the error of the trial court decision. In the federal suit, the court is faced with a total of approximately 600,000 doctors from all over the county. With such a large potential class, the number of individual denials of benefits is much greater than in our case. Beyond these factual differences, the doctors in the federal case have also alleged claims based on prompt payment statutes from a large number of states. *See In re Managed Care,* 209 F.R.D. at 681. This means the district court will be faced with a mind-boggling variety of laws to apply in the individual cases.

¶ 25 Notwithstanding the greater diversity among the individual denials of benefits, Judge Moreno saw no bar to certifying the doctors' case. He found many common questions, including the medical necessity requirements themselves, the insurers' use of actuarial guidelines, the use of an automated claims system to adjust codes and reimbursement rates as well as delaying and denying claims automatically. In addition, he saw the issue of whether a

conspiracy exists and, if so, its impact as "necessarily a common question which predominates in this action." *In re Managed Care,* 209 F.R.D. at 696.

¶ 26 This case shares the same major theme: the insurance companies' alleged common scheme to deny claims. Here, we are dealing with a much smaller plaintiff class, which indicates a greater commonality of questions. Stated differently, while the common questions are the same, there are many fewer individual questions in this proposed class. Since I agree with the district court that class certification was proper in the federal suit, *a fortiori* I conclude that it should have been granted in this case.

¶ 27 Of course, one obvious difference is that in the federal suit the plaintiffs have claimed a conspiracy in violation of the federal Racketeer Influenced and Corrupt Organizations Act [10] and the Employee Retirement Income Security Act (ERISA).[11] Here the only claim is breach of contract. This case can be distinguished by the absence of a direct conspiracy claim. Just the same, it is functionally the same as if the plaintiffs had pled civil conspiracy. Even though they did not specifically plead civil conspiracy, in effect they will be proving one, which I believe makes class certification proper.

**2. Realistically, a class action is the only way the chiropractors can present their claims.**

¶ 28 There are two ways the chiropractors could prove their allegation of an across-the-board policy to deny claims. They could either produce some sort of a "smoking gun," such as an internal memo frankly outlining the scheme, or they could establish their claim by inference. If a smoking gun exists, individual chiroprac-

---

**10.** 18 U.S.C. § 1961–1968.

**11.** 29 U.S.C.A. § 1001 *et seq.*

tors are unlikely to be able to find it. In a case against large insurance companies, the chiropractor would have to sift through reams of papers in the hope of finding the proverbial needle in the haystack. The second way to show an arbitrary policy is by statistical analysis, which would potentially prove the policy by inference. To establish a claim by inference, the individual chiropractor would have to acquire documents from non-parties, and then conduct an in-depth study to establish the suspected pattern.

¶ 29 In light of the relatively small potential recovery, the expense of the comprehensive discovery and statistical analysis needed to establish a pattern would effectively preclude litigating the cases individually. A class action, on the other hand, would enable the chiropractors to pursue their claims. This leveling-of-the-field effect is one of the benefits of and reasons for class actions. The Seventh Circuit succinctly stated the principle:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

*Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir.1997); *see also* Pa.R.C.P. 1708, Explanatory Note; *Debbs v. Chrysler Corp.*, 810 A.2d 137 (Pa.Super.2002); 5A Goodrich–Amram 2d § 1707:1; *Uniform Law Commissioners' Model Class Actions [Act] [Rule]*, Prefatory Note ("A class action is a procedure by which people with small claims or limited means can exercise their rights and thereby make our system of justice more responsive to their needs.").

¶ 30 We should bear in mind the equity underpinnings of class actions and equity's emphasis on fairness. *See Uniform Law Commissioners' Model Class Actions [Act] [Rule]*, Prefatory Note. These fairness concerns outweigh any question about the individual factors predominating. Although all five factors must be present to certify a class action, if one factor is particularly strong, it can make up for weakness in another. *See Dickler v. Shearson Lehman Hutton, Inc.*, 408 Pa.Super. 286, 596 A.2d 860, 866 (1991) (court may afford different weight to various factors). Therefore, in this case any question about whether the common questions predominate is overcome by the fairness and efficiency of a class action.

**3. The claims and defenses are sufficiently typical because they arise out of the same basic scenario.**

¶ 31 I conclude that the claims and defenses are sufficiently typical for largely the same reasons I believe the commonality requirement is met. That is, the real issue is whether the insurance companies methodically and arbitrarily denied claims. That is what the chiropractors will be trying to prove, and the insurance companies, disprove. Because both the claims and defenses will arise from the same factual and legal predicate, typicality has been established. *See D'Amelio I*, 500 A.2d at 1146; *see also In re Managed Care*, 209 F.R.D. at 695 ("Because the Provider Plaintiffs have demonstrated a common scheme or course of conduct, they also have shown typicality.").

**III. Conclusion**

¶ 32 This case is not about individual denials of benefits. Rather, it is about the chiropractors' allegations that the insurance companies systematically denied the most expensive claims. Because I do not

agree that the trial court properly denied class certification, I would reverse.